02-10-481&11-057&11-063-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00481-CV

 

 


 
 
 Jeffery A. Bell and Wanda E. Bell
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Kendall Bennett and KRB Consulting, LLC
 
 
  
 
 
 APPELLEES
 
 


 

----------

 

AND

 

NO. 02-11-00057-CV 

 

 


 
 
 Jeffery A. Bell and Wanda E. Bell
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Gary Cherry and PremierE, Inc.
 
 
  
 
 
 APPELLEES
 
 


 

----------

 

AND

 

 

 

 

NO. 02-11-00063-CV

 

 


 
 
 Jeffery A. Bell and Wanda E. Bell
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Carrizo Oil & Gas, Inc.
 
 
  
 
 
 APPELLEE
 
 


 

----------

 

 

FROM THE 271st
District Court OF Wise COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

 

          On
the court=s own motion, the above causes are
hereby consolidated for purposes of disposing of these related summary judgment
appeals in a single opinion.  Each cause shall continue to bear its respective
cause number.

          Appellants
Jeffery A. Bell and Wanda E. Bell appeal from the trial court’s grant of
summary judgments in favor of Appellees[2] disposing of the Bells’
claims for defamation, intentional infliction of emotional distress (IIED),
civil conspiracy, gross negligence, and loss of consortium; the Bells had
alleged these same claims against twenty-eight defendants after Jeff was
terminated from his oil field sales job with Express Energy.  In essence, the
Bells’ claims are a house of cards built on allegations of defamation and on stacked
inferences purportedly asserting a kickback scheme.[3] 
The Bells’ house of cards collapses because no evidence exists supporting their
defamation claims against any Appellee and because any inferences concerning a
kickback scheme are not relevant.  Because no evidence exists of a defamatory
statement published by any Appellee, no foundation exists to support any of the
Bells’ claims, and we will affirm the trial court’s grant of summary judgment
for Appellees on all of the Bells’ claims.

II.  Factual
and Procedural Background

Jeff
claims that he was terminated from Express Energy because he was defamed by Appellees. 
He claims that Appellees conspired against him because he would not participate
in an alleged kickback scheme and that Appellees intentionally inflicted
emotional distress on him.  The kickback scheme that Jeff attempts to weave
together through inferences he draws from a variety of facts is not relevant to
any element of his underlying defamation claim and is not supported by the
record.  See generally Tex. R. Evid. 401 (explaining that relevant
evidence means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more or less probable
than it would be without the evidence).  Thus, in our factual background, we
omit most of the facts from which Jeff attempts to draw inferences to show a
kickback scheme.  The facts recited below simply provide a relational framework
of the connection between the various individuals and companies here; facts
relating to other individuals or entities that were sued but that are not
involved in these appeals are omitted if not relevant to the issues involved
here.  Conflicting summary judgment evidence exists on some nonmaterial
facts––such as which companies particular individuals worked at during a
particular time––thus, our opinion contains some nonmaterial factual conflicts.

A. 
Jeff’s Deposition Testimony

          Jeff
worked in oil field sales for various companies.  As part of these jobs, Jeff
interacted with “company men”[4]
at various rigs as he attempted to sell different types of oil field services
for his then current employer—either Frank’s Casing, Premiere, or Express
Energy.

1. 
Frank’s Casing

          While
employed by Frank’s Casing, Jeff met Appellee Kendall Bennett.  Bennett was a
company man at one of the rigs Jeff called on, and Bennett split shifts with
Mike Barton.  Bennett testified that Jeff was a liar who had “played” Bennett
and his relief, Barton, off one another by telling Bennett that Barton had
promised Jeff the casing job and telling Barton that Bennett had promised Jeff
the casing job.  During Jeff’s deposition, he was questioned about this
incident:

Q       So when you
first met Mr. Kendall Bennett, I would assume that your intent was to try and
get some work at that rig, right?

 

A       Yes, sir.

 

Q       And when you
say “work,” you are talking about Frank’s Casing, casing work, right?

 

A       Yes, sir.

 

Q       Okay.  And do
you remember a conversation with Mr. Barton in which you told him that Mr.
Bennett had promised you that you could do the work on the site?

 

A       No, sir.

 

Q       Okay.  Do you
remember any conversation with my client, Kendall Bennett, in which he
basically told you that he felt that you had misrepresented an agreement that
you had with Mike Barton, and that he didn’t want you working -- that he didn’t
want you coming back out to his site?

 

A       No, sir.

 

Q       Never
happened?

 

A       Not that --
not that I can remember it never happened.

 

Q       Okay.  So as
we sit here today, you can’t remember that happening?

 

A       It didn’t
happen.

 

Q       Didn’t
happen?

 

A       Didn’t -- I
don’t remember it happening.  As far as I know, it didn’t happen.

 

Q       Okay.  Again,
I’m not trying to fuss with you, but when someone tells me they don’t recall it
happening, that tells me that it’s a possibility it happened, their memory just
may not remember it.

 

A       I guess
that’s --

 

Q       Is that what
we are saying today?

 

A       Yeah.

 

Q       Okay.  So
it’s possible it happened, you just don’t -- as we sit here today under oath,
you can’t testify that you recall it, correct?

 

A       Correct.

 

Q       Okay.  So if
Mr. Bennett comes in and Mr. Barton comes in and testifies to this jury that it
did happen, you are just in a situation where you say you don’t remember it,
but you are not denying that it did, correct?

 

A       Correct. 

 

          Also
while Jeff was working at Frank’s Casing, Jeff said that he purchased a trailer
and that the purchase had been approved by the advertising department. His boss
did not think that Jeff had received approval and thought that Jeff had
misappropriated funds.  But Jeff said that he later received a letter stating
that it was a misunderstanding and that “it was all taken care of.” 

          Jeff
later left Frank’s Casing, stating that Appellee Premiere had offered him a job
making more money and had “talked like it was a different type of environment.”
 Jeff said that he was not aware that Frank’s Casing had written on his
termination report:  “REASON FOR TERMINATION (STATE DETAILS AND ATTACH
SUPPORTING DOCUMENTS):  Paid very little attention to detail.  Did not keep up
with customers.  Worked when wanted to.  Talked in circles. . . .  Didn’t take
care of his job very well. . . . MISC. REMARKS:  Poor salesman.”  Jeff’s perspective
was that his supervisor was disappointed that he was resigning and tried to
convince him to continue working for Frank’s Casing.

2. 
Premiere

          Jeff
said that Appellee Gary Cherry, an oil field salesman with Premiere, had suggested
that he come to work at Premiere.  According to Jeff, Cherry became upset with
Jeff when Jeff spoke to one of Cherry’s customers about a mistake that Cherry
had made.  Jeff claimed that he had been asked to go talk to the customer.  Cherry
nonetheless complained to Jeff’s boss and also told Premiere’s vice president, Jim
Williams, that Jeff was trying to steal his work. 

          While
Jeff was working at Premiere, a woman named Marilyn H. who was a Premiere
employee made sexual harassment allegations against him.  Jeff said that Cherry
brought up the sexual harassment issue involving Marilyn H. at one of the
company’s functions.  Jeff explained that Cherry was talking to him and that
when Cherry saw that others were nearby, he said that he would talk to Jeff
about it later.  Jeff considered what Cherry had said to be defamatory because
it was not said one-on-one in an office. 

          Jeff
said that shortly thereafter, when he had been with Premiere for a year, he
received a phone call from vice president Jim Williams, who stated that Jeff’s
services were no longer needed; no details were provided.[5]  Jeff
was hired at Express on the same day that he was fired from Premiere. 

3. 
Express

          Jeff
testified during his deposition that he had told Ricky Wiggins, the district manager
for Express, during his initial interview with Express about Marilyn H.’s
sexual harassment allegations and that he had been accused of misappropriating
company funds for a trailer while he was at Frank’s Casing. 

          After
Jeff started working at Express, Wiggins and general manager Randy Davis told
him to go by every rig to see if they had a sales representative and to inquire
whether he or she was doing a good job.  Jeff met with Wiggins weekly to
provide updates on whom he had called on during the previous week and to recount
the feedback that he had received.  During those meetings, Wiggins told Jeff
that he was doing a good job. 

          Whenever
Jeff as a representative of Express called on Bennett, Jeff thought they had a
good visit and recalled selling Bennett a job.  Jeff
believed that Bennett worked for Denbury at the time.

4. 
The Termination

          Jeff
was fired one month after he started working at Express.  The “Personnel Action
Form” documenting Jeff’s employment termination states that the reason for Jeff’s
discharge was that “Jeff[’s] salesmanship has not shown to be beneficial to
Express Energy or him[]self.  Several customer[s—]Quicksilver[,] Denbury[, and]
Chesapeake[—] prefer not to have him.  Could be personal issues or previous
employer slander issues!”  Jeff said that Wiggins went over the personnel
action form with him but that the reason for his termination did not ring true
because he had brought in several jobs during the month that he was with Express.

          Wiggins
wrote on Jeff’s termination paperwork that Quicksilver, Denbury, and Chesapeake
had made complaints about Jeff and that there was previous employer slander.[6]  When
Jeff asked Wiggins what was said about him and who said it, Wiggins said that
it was a guy who had previously worked for New Tech and Quicksilver and was
currently working for Carrizo Oil & Gas.[7]  Jeff asked if the person
was Dickey Pate, Jr., and Wiggins smiled and changed the subject.  Jeff said
that he inferred from Wiggins’s body language that Pate, Jr. was the person who
had made the slanderous statements that had resulted in Jeff’s firing from
Express.

          Jeff
believed that Pate, Jr. had made the statement because a friend who Jeff said
worked for Carrizo had told Jeff that Pate, Jr. was the only person he knew who
had made the jump from Quicksilver to New Tech to Carrizo.  Additionally, Jeff
had talked with Pate, Jr. at one of the rigs, and Pate, Jr. had referenced that
he was glad that Marilyn H. was not there.  During that conversation, Jeff and
Pate, Jr. were the only two people present, and Jeff presumed that Cherry must
have told Pate, Jr. about the Marilyn H. issue. 

          In
his deposition, Jeff initially testified that Wiggins never said that Pate, Jr.
had made slanderous statements against Jeff.  Jeff later testified that Wiggins
in fact had told him that Pate, Jr. had called and had made accusations that
caused Jeff to lose his job, that the accusations were very serious, and that
Jeff should see an attorney.

          Jeff
testified that Wiggins said during Jeff’s exit interview that Cherry or Pate,
Jr. had made some statements about Jeff, but Wiggins did not say what the
statements were.  Jeff testified that he did not believe Wiggins’s deposition testimony
that he had never heard anything negative about Jeff from Cherry; Pate, Jr.; or
Premiere.

          Jeff
said that he believed he was terminated from Express (1) due to statements that
Cherry and Pate, Jr. had made to Wiggins and (2) due to employees of Express
feeling threatened when Jeff questioned a kickback scheme that he thought Express
salespeople utilized to obtain business from certain company men, including
Bennett and a company man at ConocoPhillips.  Jeff believed that all of the Appellees
had conspired in some form or fashion to get him fired from Express because he
had knowledge of the kickback scheme and was not willing to participate in it.  Jeff
admitted, however, that under the Express employee handbook, an employee could
be terminated for unsatisfactory work performance and/or conduct.  And Jeff agreed
that if a salesman was pitting a night company man against a day company man to
gain business, that would constitute grounds for firing that salesman.  Jeff,
however, denied engaging in such conduct because it would “bite you in the
seat” and was unethical. 

          According
to Jeff, after he was fired, Wiggins told him that Bennett did not want him back
on Bennett’s rig, but Wiggins did not go into any detail.  Jeff believed that
Bennett had called Express to complain about Jeff two or three days before Jeff
was terminated.  Jeff conceded, however, that the “previous employer slander” mentioned
on his personnel action form was not made by Bennett.  Jeff did not know what
Bennett had said that had caused Jeff to lose his job.  Jeff also did not know
what allegedly defamatory statements the other Appellees had made that Jeff
claimed Bennett had negligently accepted and relied on. 

B. 
Bennett’s Deposition

          As
a well site supervisor/consultant for Denbury, Bennett had the authority to
hire whatever vendor might be needed to perform a job.  And Bennett chose not
to use Jeff.

          Bennett
remembered Jeff “[a]s a liar.”[8]  He
recalled that when Jeff was with Premiere, he came out to the rig and he
“played” Bennett and his relief (Mike Barton) by telling Barton that Bennett
had said that Jeff could have the casing job and vice versa even though Bennett
had not said that Jeff could have the casing job.  Bennett said that Jeff got
caught in the lie and was told to leave.

          Bennett
said that a year and a half passed before Jeff came into his office on behalf
of Express.  Bennett reminded Jeff that Jeff had lied to him before and told Jeff
to leave and to not return because he was not welcome.  Jeff left.  Bennett
then picked up the phone and called Express and told either David, Joey, or
Richard/Ricky[9]
that he did not want Jeff back on his location because of what Jeff had done in
the past when he was with another company.

          Before
this lawsuit, Bennett had never heard anything derogatory about Jeff.  In his
affidavit, Bennett stated that he had never heard from anyone at any time that
Jeff was a sexual predator, assailant, or harasser and had never heard from
anyone that Jeff had committed theft or fraud.  He also stated that he was
unaware of any plan or agreement to terminate Jeff; he simply did not want Jeff
at his jobsite based on his past personal experience with Jeff and what he perceived
as a lie by Jeff.

C. 
Wiggins’s Deposition

          Wiggins,
the district manager for Express, said that Jeff made a few sales for Express after
he was hired, but then Wiggins started receiving complaints about Jeff.  Wiggins
followed-up on the complaints with phone calls.

          Wiggins
believed that Bennett had made one of the earlier complaints, requesting that
Express send someone else to his rig because he had encountered problems with
Jeff on prior jobs.  Bennett did not specify what the problems were but gave
Wiggins the impression that the problems were related to a sensitive issue. 

          Wiggins
could not recall the names of the company men at Quicksilver, Denbury, or
Chesapeake who had complained about Jeff, but all three customers said that
they preferred not to have Jeff at their rig site.  Chesapeake did not want
Jeff on site because he had made mistakes and had “issues outstanding” when he had
worked for Premiere and Frank’s Casing; Wiggins, however, did not know what
mistakes Jeff had made that Chesapeake was critical of, nor did Wiggins know
“what the specific issue was when he [Jeff] worked for Premiere or Frank’s
Casing.”  Two people from Denbury told Wiggins that they preferred not to have
Jeff at their location.  Wiggins could not recall who from Quicksilver had told
him that he would prefer a different salesman.[10]  Wiggins
reassigned Jeff to other areas after the complaints came in, but Jeff did not
get any new sales for Express. 

          Wiggins
told Mike Byrd (vice president of drilling for Express) and Randy Davis
(general manager for Express) that Jeff’s paperwork was wonderful but that
three customers did not want him on location; Wiggins indicated that he did not
know the reasons for the customers’ decisions.  Wiggins also told Byrd and
Davis about what Bennett had said.  Wiggins stated that the personnel action
form came about after Byrd, Davis, and Wiggins decided to fire Jeff.  Wiggins
said that their decision was not based on Bennett’s comment that the reason he
did not want Jeff on the jobsite was sensitive.  Wiggins said that Jeff was
terminated “for his poor performance on the three customers [Quicksilver,
Denbury, and Chesapeake] that he was actually based to achieve work with and
maintain good customer relationship with.  He didn’t have to sell anything.  It
was given to him.” 

          When
asked what might have been affecting Jeff’s job performance at Express, Wiggins
said that he only knew what Jeff had used as an excuse—“his
prior employer’s possibly talking slanderish about him in the field.”  Wiggins
said that situation included an ongoing sexual harassment lawsuit.  Wiggins said
that Jeff did not disclose the sexual harassment action in the initial
interview but told Wiggins about it after Wiggins hired him.  Wiggins said that
Jeff also told him that “the guys over there [at Frank’s Casing] were talking
bad about him” and that he had been accused of using a barbeque pit or company
money for personal use and not returning it.  Wiggins said that he first heard
about both the sexual harassment lawsuit involving Jeff and about the Frank’s
Casing allegations of misusing company property or company funds from Jeff.

          Wiggins
came to the conclusion that either Jeff had personal issues with a lot of
company men or that other employers had blemished Jeff’s sales ability.  Wiggins
said that his personal opinion was that the “personal issues” that Jeff had
were that “his presentation to a customer would probably get you kicked off a
location.”  Wiggins explained that his note on the personnel action form “could
be personal issues” related to Jeff’s inability to change with the customers’
needs.  Wiggins’s note about “previous employer slander issues” related to what
Jeff had personally told him about his prior employment issues.

          Although
Jeff listed Wiggins as an eyewitness to the defamatory statements forming the
basis of these lawsuits, Wiggins testified that he had no personal knowledge of
any negative comments or defamatory statements made about Jeff by Pate (Jr. or
Sr.), Cherry, or Premiere.  Wiggins said that he had heard from Express
salespeople after Jeff left Express that Jeff had been accused of stealing a
barbeque pit when he worked for Frank’s Casing, of misappropriating funds on a
credit card or personal expense account, and of being involved in a sexual
harassment case.  Wiggins said that Jeff had told “a lot of people” about the
sexual harassment case.

D. 
Cherry’s Deposition

          Cherry
was a salesman with Premiere from July 2006 to December 15, 2009.  Cherry
recommended Jeff for the job at Premiere.  Jeff rode with Cherry the first
three days that he was on the job, and Cherry showed him how Premiere did their
sales calls and paperwork.  Cherry later heard that Jeff spent a lot of time in
making sales calls, wasting the time of company men.

          A
few days after Jeff started working with Cherry at Premiere, Jeff told Cherry
about the accusations he faced at Frank’s Casing related to the trailer and
barbeque pit.  Cherry told Jeff to tell Premiere vice president Jim Williams
about the barbeque grill and trailer, and he did so.

          Cherry
said that Marilyn H. mentioned to him that she had experienced “inappropriate
verbiage” from a salesman; Cherry said that he did not want to know about it
and that she should report it to upper management.  Cherry said that he
believed that the salesman that Marilyn H. had referred to was Jeff because
Jeff also called him about the situation, and he had given Jeff the same advice.
 Cherry never told anyone about Jeff’s issues with Marilyn H.

          Cherry
made sales for Premiere to Pate, Jr. while Pate, Jr. was at Quicksilver and
later at Carrizo.  The only conversation Cherry had with Pate, Jr. that
mentioned Jeff was when Pate, Jr. told him that he wanted Cherry to do his
work, not Jeff.  This occurred when Jeff was working for Premiere.

          Cherry
denied calling Express or contacting Wiggins to complain about Jeff.  Cherry reiterated
that he had not said anything about Jeff that was negative.

E.  Trial
Court’s Disposition

          After
hearing arguments, the trial court granted Appellees’ motions for summary
judgment.  These appeals followed.

III.  Summary Judgment Standards
of Review

A. 
No-Evidence Summary Judgment

          After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant’s claim or
defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence.  Id.; Timpte Indus., Inc. v.
Gish, 286 S.W.3d 306, 310 (Tex. 2009).  The trial court must grant the
motion unless the nonmovant produces summary judgment evidence that raises a
genuine issue of material fact.  See Tex. R. Civ. P. 166a(i) & cmt.;
Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).

          When
reviewing a no-evidence summary judgment, we examine the entire record in the
light most favorable to the nonmovant, indulging every reasonable inference and
resolving any doubts against the motion.  Sudan v. Sudan, 199 S.W.3d
291, 292 (Tex. 2006).  We review a no-evidence summary judgment for evidence
that would enable reasonable and fair-minded jurors to differ in their
conclusions.  Hamilton, 249 S.W.3d at 426 (citing City of Keller v.
Wilson, 168 S.W.3d 802, 822 (Tex. 2005)).  We credit evidence favorable to
the nonmovant if reasonable jurors could, and we disregard evidence contrary to
the nonmovant unless reasonable jurors could not.  Timpte Indus., 286
S.W.3d at 310 (quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582
(Tex. 2006)).  If the nonmovant brings forward more than a scintilla of
probative evidence that raises a genuine issue of material fact, then a
no-evidence summary judgment is not proper.  Smith v. O’Donnell, 288
S.W.3d 417, 424 (Tex. 2009); King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 751 (Tex. 2003), cert. denied, 541 U.S. 1030 (2004).

B. 
Traditional Motion for Summary Judgment

          We
review a summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light
most favorable to the nonmovant, crediting evidence favorable to the nonmovant
if reasonable jurors could, and disregarding evidence contrary to the nonmovant
unless reasonable jurors could not.  Mann Frankfort Stein & Lipp Advisors,
Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every
reasonable inference and resolve any doubts in the nonmovant’s favor.  20801,
Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008).  A defendant who
conclusively negates at least one essential element of a cause of action is
entitled to summary judgment on that claim.  Frost Nat’l Bank v. Fernandez,
315 S.W.3d 494, 508 (Tex. 2010), cert. denied, 131 S. Ct. 1017 (2011); see
Tex. R. Civ. P. 166a(b), (c).

IV. 
Trial Court
Properly Granted
Summary Judgment

to
All Appellees
on All of
the Bells’
Claims

 

          The
trial court granted summary judgment for Bennett, KRB, and Carrizo on their
no-evidence and traditional motions for summary judgment without noting whether
it was granting the no-evidence motion or the traditional motion.  We therefore
analyze the propriety of the summary judgments granted in favor of Bennett,
KRB, and Carrizo under the no-evidence standard first.  Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 600 (Tex. 2004) (explaining that when a party
moves for summary judgment under both rules 166a(c) and 166a(i), we should
review the no-evidence motion first).  Cherry and Premiere also filed a no-evidence
and a traditional motion for summary judgment.  The trial court’s order,
however, expressly granted Cherry and Premiere’s traditional motion for summary
judgment.  We therefore analyze the propriety of the summary judgment granted
in favor of Cherry and Premiere under only the traditional summary judgment
standard.

In their
first issue, the Bells generally challenge the trial court’s grant of summary
judgment in favor of all Appellees.  In five subissues, the Bells challenge the
trial court’s grant of summary judgment in favor of Appellees on each of the
following claims:  defamation, IIED, civil conspiracy, gross negligence, and
loss of consortium.  The Bells’ pleadings indicate that all of their claims hinge
on the alleged defamation—that is, the IIED claim is based on the emotional
distress that Jeff alleged he suffered as a result of the defamation and its
consequences; the civil conspiracy claim is predicated on an allegation of a conspiracy
to defame Jeff; the gross negligence claim is based on the alleged tort of
defamation; and Wanda’s loss of consortium claim is based on the alleged defamation
of her husband.

A.  Summary
Judgment on Defamation Claims Was Proper

1. 
The General Law Concerning Defamation

          “Defamation”
is generally defined as the invasion of a person’s interest in his or her
reputation and good name.  Prosser & Keeton on Torts § 111, at 771 (5th ed.
1984 & Supp. 1988).  “Defamation” encompasses both libel and slander.  By
statute, Texas law defines “libel” as a defamation expressed in written or
other graphic form that tends to injure a living person’s reputation and thereby
expose the person to public hatred, contempt, ridicule, or financial injury or
to impeach any person’s honesty, integrity, virtue, or reputation or to publish
the natural defects of anyone and thereby expose the person to public hatred,
ridicule, or financial injury.  Tex. Civ. Prac. & Rem. Code Ann. § 73.001
(West 2011).  Although “slander” is not statutorily defined, at common law,
slander is a defamatory statement that is orally communicated or published to a
third party without legal excuse.  Randall’s Food Mkts., Inc. v.
Johnson, 891 S.W.2d 640, 646 (Tex. 1995).  To prevail on a
defamation claim, the plaintiff must prove that the defendant (1) published a
statement, (2) that was defamatory concerning the plaintiff, (3) while acting
with negligence, if the plaintiff was a private individual, regarding the truth
of the statement.  See WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571
(Tex. 1998), cert. denied, 526 U.S. 1051 (1999).

2. 
Application of the Law to the Present Facts

          Here,
the Bells pleaded,

          On three
separate occasions from August 22, 2008 through September 24, 2008, Defendants
told the drilling rig foremen (called “company men” in the trade) of three
separate drilling rigs – one rig being operated by Chesapeake – a second rig
being operated by Denbury – and a third rig being operated by Quicksilver –
that Plaintiff Jeffery Bell was a sexual predator/assailant/harasser while
working at his previous employment with Premiere, Inc., and that he committed
theft/fraud while working at his previous employment with Frank’s Casing.

Nowhere
in their pleadings, their summary judgment response, or in their brief on
appeal, however, do the Bells set forth or identify the alleged defamatory
statements that they contend were made or identify who specifically made them. 
Although Jeff was asked repeatedly in his deposition to identify what allegedly
defamatory statements were made and who made them, he repeatedly testified that
he did not know what was said or who said it, just that it must have been bad: 

Q       And can you
tell me what statement has been made by any of these parties that you are
claiming are defamatory, what the statement is?

 

A       I don’t know
exactly what the statements, you know, were.  I was just told when you see on
that piece of paper [the personnel action form that he received when fired from
Express] you got a copy of that it was serious enough that it caused me to lose
my job and I needed to go see an attorney. 

Specifically
concerning Bennett, Jeff testified: 

Q  And do you know
the reasons these customers preferred not to have you on their rigs and not to
have you come by and -- representing Express, try and make sales?

 

A  No, sir, I do not.

 

Q  As we sit here
today, do you know?

 

A  Not really,
because I had a good working relationship for two years, so I don’t know.

 

Q  Well, you sued my
client [Bennett], correct?

 

A  Yes, sir.

 

Q  And you sued my
client for what reason?

 

A  Because,
obviously, if it’s written on a piece of paper that Denbury doesn’t want me at
their rig, then something had to happen.

 

Q  All right.

 

A  I don’t know what
had happened, and went in and tried to find out what happened.

 

          Through the
deposition with Mr. Ricky Wiggins, he just kept using Kendall Bennett and Mike
Barton.

 

Q  Okay.  And what
did he say about Kendall Bennett and Mike Barton?

 

A  I don’t remember
the exact wording in his deposition, but he kept saying it was because
something at -- because of them.

 

Q  And so that’s why
you sued my client?

 

A  Something was said
negative enough to cause me to lose my job.

 

Q  And what was that
negative thing that Kendall Bennett said to cause you to lose your job?

 

A  I honestly don’t
know. 

 

Q  Okay.  And nobody
from Express told you that Kendall Bennett said something negative about you
that caused them to terminate you, did they?

 

A  They told me that
Kendall Bennett had called in and said that he didn’t want me back at his rig.

 

          . . . .

 

Q  Okay.  Is that the
negative statement, you think?

 

A  Yeah, it’s pretty
negative.  When you think you got a good relationship, like me and you talking,
and the next thing you know, you don’t know that you’ve offended somebody. 
They don’t want you back, it’s -- you don’t know why.

 

Q  And you still
don’t know why, do you?

 

A  Huh-uh.

 

          . . . .

 

Q  And I’ve asked you
under oath to tell me what slanderous statements my client made about you, and
what you’ve told the jury is all you can say is Mr. Bennett allegedly called
your employer and said he didn’t want you out on any of his rigs, correct? 
Right?

 

A  That’s correct.

 

          . . . .

 

Q  Tell me and this
jury what the slanderous statements my client made against you were.

 

          I mean, if
you don’t know, just say you don’t know.  But I’d like to know.

 

A  I really don’t
know. 

Thus,
the Bells fail to identify any alleged defamatory statement by any Appellee.

Moreover,
during his deposition, Jeff testified that he had disclosed the sexual
harassment charges and the Frank’s Casing misappropriation allegations to
Wiggins immediately after he was hired by Express:

Q       In fact, Mr.
Wiggins states that the information about the sexual harassment lawsuit
involving you was told to him by you and nobody else.  Do you believe that?

 

A       I did tell
him that before I took the job, because I did not want something to come up and
bite me after I got hired.  I felt like full disclosure was the best thing to
do.  And if I got hired that way, then I didn’t have nothing to worry about.  I
didn’t want to take the job under false pretenses and someone disclose and lose
it.

 

Q       So are you
telling -- are you telling me that you told Mr. Wiggins about the sexual
harassment suit before he hired you.

 

A       Yes, ma’am.

 

          . . . .

 

Q       Okay.  If Mr.
Wiggins testified that the allegations of you working at Frank’s Casing of
using company property or company funds or whatever happened at Frank’s Casing,
he was only made aware of by you?

 

A       Correct.  I
disclosed everything that happened at Frank’s same as I did with Premiere in
the interview when I got the job.  And he . . .

 

          . . . .

 

Q       (By Ms.
Kennedy) So if it’s your testimony that you were let go because Mr. Wiggins
knew of this conversation between Mr. Cherry and Mr. Pate, even though he says
he didn’t know anything about it, that is what you are basing your lawsuit
against Mr. Cherry on; would that be correct?

 

A       Yes. 

 

          . . . .

 

Q       Okay. 
Earlier I believe you testified that you told Mr. Wiggins about Marilyn H[.]’s
allegations and also about the allegations of theft from Frank’s Casing; is
that correct?

 

A       Yes, ma’am.

 

Q       Did you tell
anyone at Express about that -- those allegations?

 

A       Well, I think
Randy Davis was there and there was the guy over the shop -- I can’t think --
Marty -- I can’t think of his name.  Like I said, there’s three or four of us
in there and I disclosed everything. . . . 

Thus,
the summary judgment evidence establishes that Jeff himself disclosed to
Wiggins the very information that he apparently alleges caused him to be fired
from Express because it was disclosed to Wiggins by Appellees.

The
summary judgment evidence, viewed in the light most favorable to Jeff, fails to
constitute a scintilla of evidence that any Appellee made a defamatory
statement concerning Jeff and, in fact, conclusively negates the existence of a
defamatory statement by Appellees.  Although the summary judgment evidence
establishes that Bennett advised Express that he would not work with Jeff because
he had previously been “played” by Jeff and did not feel that Jeff was
trustworthy, Jeff himself agreed during his deposition that this statement by
Bennett was not defamatory and did not constitute the basis for his defamation
claim.

          Likewise,
the summary judgment evidence establishes that Cherry spoke with Jeff on one
occasion at a company function about Marilyn H.’s sexual harassment claim, that
Jeff himself had previously told Cherry about that issue, that Cherry halted
the conversation at the company event when others approached, and that Cherry
said that he had not told anyone about Jeff’s issues with Marilyn H. 

          To
the extent that the Bells attempt to hold Carrizo liable based solely on
statements allegedly made by Pate, Jr., the summary judgment evidence
establishes that Pate, Jr. has never been an employee of Carrizo.  And Pate,
Jr.’s motion for summary judgment was granted prior to Carrizo’s motion being
heard; thus, because Pate, Jr. had been granted summary judgment on the
defamation claims that the Bells pleaded against him, Carrizo was also entitled
to summary judgment on the defamation claims that the Bells pleaded it was
vicariously liable for based on Pate, Jr.’s purported statements.

          In
short, no evidence exists that any Appellee published a defamatory statement
about Jeff.  Jeff agreed that Bennett’s I-don’t-want-to-work-with-Jeff
statement, which was based on Bennett’s personal experience, was not
defamatory.  No evidence exists identifying a defamatory statement that was
made or published by Carrizo or an employee of Carrizo.  Cherry and Premiere conclusively
negated an essential element of Jeff’s defamation claim––the existence of a
defamatory statement published by Cherry.  Accordingly, we hold that the trial
court did not err by granting Bennett and KRB’s and Carrizo’s motions for
no-evidence summary judgment on the Bells’ defamation claims or by granting Cherry
and Premiere’s motion for traditional summary judgment on the Bells’ defamation
claims.  See Tomlinson v. McComas, No. 02-11-00175-CV, 2011 WL 5607604,
at *8 (Tex. App.—Fort Worth Nov. 17, 2011, pet. filed) (holding that statements
regarding how president of homeowners’ association presided over matters
constituted opinions that were not actionable for defamation).  We therefore
overrule subissue A relating to the grant of summary judgment to Appellees on
the Bells’ defamation claims.

B.  Summary Judgment
on Intentional Infliction of

Emotional Distress
Claims Was Proper

 

          In
subissue B, the Bells argue that the trial court erred when it granted summary
judgment to Appellees on the Bells’ claims of IIED.  In the Cherry/Premiere appeal
and the Carrizo appeal, the Bells concede that their “IIED claims are not
permitted because the Bell[s] have other remedies at law, and therefore, an
IIED claim is an impermissible ‘gap-filler.’”  We therefore overrule the Bells’
subissue B as it pertains to Appellees Cherry, Premiere, and Carrizo.  We hold
that the trial court did not err by granting summary judgment for these
Appellees on the Bell’s IIED claims.

          In
the Bennett/KRB appeal, the Bells argue that Bennett and KRB are liable to the
Bells for IIED “because the Texas Supreme Court specifically allows IIED claims
when an employee is wrongfully terminated by an employer who is engaged in
conduct ‘bordering on serious criminal acts.’”  Specifically, the Bells argue
that Bennett and KRB engaged in serious criminal acts when they engaged and
participated in the illegal kickback and bribery schemes of Express and that
“all of [the] Bell[s’] IIED claims are based on Bennett and KRB’s conduct that
[constitutes] serious criminal acts or ‘bordering on serious criminal acts.’”

          As
noted above, the Bells’ arguments related to any alleged kickback scheme are
not relevant to any element of defamation.  See Tex. R. Evid. 401.  And
the Bells have not pleaded any other cause of action or tort that would permit their
IIED claims.  Accord Stephan v. Baylor Med. Ctr. at Garland, 20
S.W.3d 880, 892 (Tex. App.—Dallas 2000, no pet.) (stating that “[a]bsent a
false and defamatory statement, Baylor’s conduct in publishing the report could
not be extreme or outrageous as required for an intentional infliction of
emotional distress claim”).  Because no evidence exists that any Appellee
published a defamatory statement concerning Jeff and because the Bells do not
allege any other purportedly extreme or outrageous conduct by Appellees, the
Bells’ IIED claims fail.  See Creditwatch, Inc. v. Jackson, 157 S.W.3d 814,
816 (Tex. 2005) (stating that IIED is a “gap-filler” tort never intended to
supplant or duplicate existing statutory or common-law remedies and that even
if other remedies do not explicitly preempt the tort, their availability leaves
no gap to fill); Hoffmann-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438,
447–48 (Tex. 2004) (stating that “[w]here the gravamen of a plaintiff’s
complaint is really another tort, intentional infliction of emotional distress
should not be available” and citing with approval three defamation cases in
which IIED was not available as an independent claim); see also Brewerton v.
Dalrymple, 997 S.W.2d 212, 216 (Tex. 1999) (holding that the conduct
complained of—that defendants made negative comments that were reflected in
professor’s tenure file, repeatedly recommended that professor should not be
allowed to continue on tenure track, restricted his speech regarding contents
of his tenure folder, and allegedly assigned him an excessive case load—did not
rise to level of extreme and outrageous, and thus, IIED claim failed as a
matter of law).  We hold that the trial court did not err by granting either
no-evidence or traditional summary judgments on the Bells’ IIED claims.  We
overrule the remainder of the Bells’ subissue B.

C. 
Summary Judgment on Civil Conspiracy Claims Was Proper

          In
subissue C, the Bells argue that the trial court erred by granting summary
judgment to Appellees on the Bells’ claims for civil conspiracy.  Appellees
respond that there was no evidence of any defamatory statement and that the
Bells have not produced any evidence of a conspiracy. 

          An
actionable civil conspiracy is a combination by two or more persons to
accomplish a lawful purpose by unlawful means.  Massey v. Armco Steel Co.,
652 S.W.2d 932, 934 (Tex. 1983).  The essential elements of a civil conspiracy
are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of
the minds on the object or course of action; (4) one or more unlawful, overt
acts; and (5) damages as the proximate result.  Tri v. J.T.T., 162
S.W.3d 552, 556 (Tex. 2005); Juhl v. Airington, 936 S.W.2d 640, 644
(Tex. 1996); Triplex Commc’ns, Inc. v. Riley, 900 S.W.2d 716, 719 (Tex.
1995).  It is not the agreement itself but an injury to the plaintiff resulting
from an act done pursuant to the common purpose that gives rise to a cause of
action for civil conspiracy.  Carroll v. Timmers Chevrolet, Inc., 592
S.W.2d 922, 925 (Tex. 1979).  In other words, recovery is not based on the
conspiracy but on an underlying tort.  Tilton v. Marshall, 925 S.W.2d
672, 681 (Tex. 1996).  Thus, a conspiracy claim is a derivative tort.  Id.

          The
Bells alleged that Appellees defamed Jeff as the underlying tort to support
their conspiracy claim.  But, as explained above, there is no summary judgment
evidence of any defamatory statement published by any Appellee.  Therefore, the
Bells again attempt to interject their contention that an elaborate kickback
scheme existed among Appellees, and their theory that because Jeff refused to participate
in the scheme, Appellees conspired to have him fired.  The kickback scheme was
not pleaded as any type of independent tort or cause of action by the Bells,
and the summary judgment evidence contains no evidence to support that any two
Appellees had a meeting of the minds on any specific object or course of action
in furtherance of a conspiracy.  See Miller v. Raytheon Aircraft Co.,
229 S.W.3d 358, 382 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (concluding
that appellant produced no evidence of meeting of minds to perform an unlawful
act necessary to establish civil conspiracy claims).  We hold that the trial
court did not err by granting summary judgment for all Appellees on the Bells’
claims for civil conspiracy.  See id. (holding that trial court properly
granted summary judgment on appellant’s civil conspiracy claims because there
was no evidence of meeting of the minds); Malone v. Malone, No. 02-08-00157-CV,
2009 WL 2579629, at *4 (Tex. App.—Fort Worth Aug. 20, 2009, pet. denied) (mem.
op.) (holding that trial court did not err by granting brother’s no-evidence
summary judgment on sister’s civil conspiracy claim because sister presented no
evidence that brother had engaged in a civil conspiracy to breach any potential
fiduciary duty that he owed to sister).  We overrule the Bells’ subissue C
relating to the grant of summary judgment to Appellees on the Bells’ civil
conspiracy claims.

D. 
Summary Judgment on Gross Negligence Claims Was Proper

          In
the Bells’ subissue D, they argue that the trial court erred by granting
summary judgment to Appellees on the Bells’ claims for gross negligence.  The
Bells argue that “whether the underlying basis of liability against [Appellees]
is defamation or intentional infliction of emotional distress, or civil
conspiracy to commit same, the Bell[s’] evidence directly establishes gross
negligence.”  As we held above, no evidence exists that any Appellee defamed
Jeff, and no evidence exists of a civil conspiracy among Appellees; thus, there
is likewise no evidence to support the Bells’ claims for gross negligence.  See,
e.g., Rodriguez v. Wal-Mart Stores, Inc., 52 S.W.3d 814, 821 (Tex. App.—San
Antonio 2001, pet. granted), overruled on other grounds, 92 S.W.3d 502
(Tex. 2002) (stating that negligence and gross negligence claims cannot exist
independent from malicious prosecution claim and declining to hold that a duty
exists outside the torts of malicious prosecution and defamation not to falsely
accuse someone of criminal wrongdoing).  We overrule the Bells’ subissue D
relating to the grant of summary judgment to Appellees on the Bells’ gross
negligence claims.

E.  Summary Judgment
on Wanda’s Loss of Consortium

Claims Was Proper

 

          The
Bells argue in subissue E that the trial court erred by granting summary
judgment to Appellees on Wanda’s claims for loss of consortium. Claims for loss
of consortium are derivative.  Motor Express, Inc. v. Rodriguez, 925
S.W.2d 638, 640 (Tex. 1996); Whittlesey v. Miller, 572 S.W.2d 665, 667
(Tex. 1978).  Furthermore, loss of consortium damages are recoverable only when
the nonderivative claim resulted in physical injury.  Motor Express, Inc.,
925 S.W.2d at 640; Browning-Ferris Indus., Inc. v. Lieck, 881 S.W.2d
288, 294 (Tex. 1994).  Because the summary judgment was proper for all
Appellees on all of the Bells’ pleaded causes of action, Wanda’s derivative
loss of consortium claims likewise fail.  See Motor Express, Inc., 925
S.W.2d at 640 (holding that wife’s claims were not recoverable as a matter of
law); see also Brewerton, 997 S.W.2d at 217 (holding that wife’s loss of
consortium claim failed because it was wholly derivative of her husband’s IIED
claim, which the court held failed as a matter of law).  We hold that the trial
court did not err by granting the no-evidence motions for summary judgment
filed by Bennett and KRB and Carrizo and by granting Cherry and Premiere’s
motion for traditional summary judgment on Wanda’s loss of consortium claims.  We
overrule the Bell’s subissue E.

V.  Trial Court Did Not Err by Striking Bankruptcy Expert

          In
the Bennett/KRB appeal, the Bells raise a second issue—that the trial court
erred when it struck their bankruptcy expert witness, bankruptcy trustee
William Bonney.  The Bells state that “Bonney’s expert opinion . . . is that
Bennett is guilty of federal bankruptcy crimes as a result of his failure to
report bonus income and the acquisition of the 2006 Ford Mustang and the 2002
Harley Davidson motorcycle” and that “Bonney’s expert testimony in the
bankruptcy area is vital to the Bell’s claims that Bennett was intentionally
concealing the Harley and the Mustang.”

          Admissibility
of expert testimony is a matter within the trial court’s discretion.  K-Mart
Corp. v. Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000); E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).  To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Low
v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings,
134 S.W.3d 835, 838–39 (Tex. 2004).

          Texas
Rule of Evidence 702, which governs the admission of expert testimony,
provides, “If scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise.”  Tex. R.
Evid. 702.  However, Texas Rule of Evidence 402 states, “Evidence which is not
relevant is inadmissible.”  Tex. R. Evid. 402.

          Here,
Bonney’s expert testimony about Bennett’s bankruptcy is not relevant to any
element of the Bells’ defamation claims.  Nor is Bonney’s expert testimony about
Bennett’s bankruptcy relevant to any element of the Bells’ other pleaded
claims.  Because Bonney’s expert testimony was not relevant to any of the
claims brought by the Bells, we hold that the trial court did not abuse its
discretion by striking Bonney as an expert witness.  See Boulle v. Boulle,
254 S.W.3d 701, 707–08 (Tex. App.—Dallas 2008, no pet.) (holding that trial
court properly excluded expert testimony that was not relevant to any ultimate
issue before the jury).  We overrule the Bells’ second issue in the Bennett/KRB
appeal.

VI.  Conclusion

          Having
overruled all of the Bells’ issues and subissues, we affirm the trial court’s
judgments.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and MEIER, JJ.

 

DELIVERED:  March 15, 2012 









[1]See Tex. R. App. P. 47.4.





[2]For ease of reference, the
five defendants involved in this consolidated appeal will be referred to as
“Appellees” when discussed as a group.  To the extent that the consolidated
appeals need to be referred to individually, they will be denoted as “the
Bennett/KRB appeal,” “the Cherry/Premiere appeal,” and “the Carrizo appeal.”





[3]See Republic Nat’l Bank
of Dallas v. Eiring, 240 S.W.2d 414, 416 (Tex. Civ. App.—Amarillo 1951, no
writ) (stating that “Appellant’s theory above outlined is a house of cards
based solely upon the primary assumption that the lease to Kingwood Oil Company
is upon the Northeast ¼ of Section 22, Block D-5” and that “[t]he fallacy of
appellant’s theory is shown by checking the Kingwood Oil Company lease wherein
it is found that such lease does not in fact cover the Northeast ¼ of Section
22, Block D-5 . . . .”); see generally Melancon v. State, 66 S.W.3d 375,
387 n.3 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d) (stating that
“[h]ere, the house of cards is even more tenuous; an inference is based upon
another inference, upon another and yet another”).





[4]Jeff explained that the
company man made decisions regarding who “he was going to use to do whatever
type of work was going to be done.”





[5]Approximately one month
after Jeff was fired from Premiere, he went to pick up his last paycheck.  Jeff
claims that he spoke with Chris Meche who told him that Premiere employees Cherry
and Jim Reposa had been trying to get rid of him for a year.  Jeff said that
Reposa told Jim Williams that Jeff had stolen work from him; Jeff claimed that
Reposa had in fact reassigned certain rigs to him.  Jeff was not told by Jim Williams
that during the previous year Jeff had been the lowest income producer for the
district.





[6]Jeff admitted that Wiggins
did not make a defamatory statement when he told Jeff that he liked his work
but that they had made a decision based on what was written on the personnel
action form.  And Jeff had no knowledge of Wiggins’s making any slanderous
statements about Jeff to anyone else.





[7]Jeff believed that Wiggins’s
explanation described the employment history of a man named Dickey Pate, Jr.





[8]Bennett stated that Jeff lied
when he said that Bennett had participated in a kickback scheme by illegally
receiving a Harley Davidson and a 2006 Mustang.  And although Jeff’s sales call
notes indicated that Jeff had visited Bennett several times, Bennett said the
visits documented were lies.





[9]These individuals are
unidentified in the record.  During his deposition, Bennett did not recall that
in his affidavit he had stated that he had spoken with Richard Wiggins at
Express.





[10]A New Tech employee told
Wiggins that while Jeff was with Premiere, Jeff had told three Quicksilver
employees that he had been approved for a job at Quicksilver, but none of the
three had actually approved him.  The three Quicksilver employees figured it
out when a piece of equipment broke, and they questioned why they had chosen to
use Jeff.